## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DONTE HILL | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 19-2156 |
| | : | |
| CITY OF PHILADELPHIA, | : | |
| PHILIP NORDO and | : | |
| RONALD S. DOVE | : | |
| | : | |
| Defendants. | : | JURY TRIAL DEMANDED |

### AMENDED COMPLAINT

Plaintiff, Donte Hill ("Plaintiff"), by and through his undersigned attorneys, VSCP LAW, states, by way of Amended Complaint against Defendant, as follows:

### SUMMARY OF THE ACTION

1.    Plaintiff brings this action against Philip Nordo and Ronald S. Dove, as well as the City of Philadelphia, pursuant to 42 U.S.C. §1983 and supplemental claims under state law to redress permanent, life-altering physical and psychological injuries suffered by Plaintiff. The negligence and deliberate indifference of these Defendants led to Plaintiff's wrongful imprisonment for murder for over three (3) years.

2.    Defendant, Philip Nordo ("Defendant Nordo"), a Philadelphia Police Detective, used his power and position to coerce and intimidate his potential victims. Defendant Nordo would groom individuals to submit to his sexually coercive advances by gaining their trust and bestowing favors on them. Defendant Nordo used his position of authority to engage in police misconduct involving interviews of potential witnesses and suspects, including Plaintiff.

1

3.      Defendant Ronald S. Dove ("Defendant Dove"), a Philadelphia Police Detective, used his power and position to coerce and intimidate his potential victims. Defendant Dove used his position of authority to engage in police misconduct involving interviews of potential witnesses and suspects, including Plaintiff.

4.      Defendant Dove's misconduct began with the initial investigation into the shooting death of Mr. Wright on July 6, 2011, and continued until he was fired in November 2013.

5.      The misconduct by the PPD continued when Defendant Nordo took over the investigation of Mr. Wright's death, which misconduct led to an Affidavit of probable cause to support a warrant for Plaintiff's arrest, based on tampered eyewitness testimony and fabricated evidence by Defendants, Dove and Nordo.

6.      On August 5, 2014, Plaintiff was arrested, detained and confined in prison for murder charges.

7.      Plaintiff's criminal defense counsel conducted an extensive investigation into he irregularities, tampered eyewitness testimony and fabricated evidence against Plaintiff, and petitioned the Court to dismiss his murder charges based on Defendants Nordo and Dove's misconduct on September 15, 2017.

8.      On September 26, 2017, the Honorable Steven R. Geroff granted the Prosecution's Motion to *Nolle Prosse*.

9.      On September 26, 2017, Plaintiff was finally released from prison. By that time, Plaintiff had been imprisoned for over three (3) years.

10.     Defendant, City of Philadelphia ("Defendant City"), had knowledge that Defendants, Nordo and Dove, had engaged in inappropriate and illegal conduct during criminal investigations for years before Plaintiff was subjected to their misconduct.

11.     As of 2005, Defendant City was aware of credible complaints that Defendant Nordo had engaged in consistent and pervasive misconduct with suspects and informants. Despite Defendant City's awareness of facts demonstrating this alarming and criminal pattern and practice of behavior, Defendant

City failed to train, supervise or discipline Defendant Nordo. Instead, Defendant City allowed Defendant Nordo's conduct to continue unabated and, shockingly, promoted him to serve as a detective in the PPD's most prestigious investigative unit, the Homicide Division.

12.     As of 2013, Defendant City was aware of credible complaints that Defendant Dove had engaged in consistent and pervasive misconduct with suspects and informants. Despite Defendant City's awareness of facts demonstrating this alarming and criminal pattern and practice of behavior, Defendant City failed to train, supervise or discipline Defendant Dove. Instead, Defendant City allowed Defendant Dove's conduct to continue unabated.

13.     Defendant City's failure to properly ensure that a comprehensive and credible investigation into allegations of misconduct against Defendants, Nordo and Dove, and imposition of appropriate discipline permitted Defendants, Nordo and Dove, to continue their inappropriate and illegal conduct. Defendant City's deliberate indifference to these very credible and concerning allegations emboldened Defendants, Nordo and Dove, over the years to coerce and intimidate witnesses and suspects resulting in the arrest and conviction of innocent men, like Plaintiff. Defendant City was aware that their own investigative body to oversee police misconduct was ineffective and inadequate at addressing the abuses of power and constitutional violations perpetrated by their own police force.

14.     On August 5, 2014, Plaintiff became a victim of Defendants, Nordo and Dove, as a result of Defendant City permitting Defendants, Nordo and Dove, to be integrally involved in investigating homicides, despite their well-known misconduct. Defendants Nordo and Dove's misconduct led to an Affidavit of probable cause to support a warrant for Plaintiffs arrest on charges of murder. The case against Plaintiff was based on tampered eyewitness testimony and fabricated evidence by Defendants, Nordo and Dove.

15.     On August 5, 2014, Plaintiff was arrested, detained and confined in prison.

16.     After Plaintiffs arrest, his criminal defense counsel conducted an extensive investigation into the propriety of Defendants Nordo and Dove's misconduct, wherein it was discovered that Defendants, Nordo and Dove, tampered with eyewitness testimony and fabricated evidence against Plaintiff, and reached

the conclusion that the content of the tampered eyewitness testimony and fabricated evidence was contrary to the known facts of the case, and that Defendants, Nordo and Dove, had a very extensive history of fabricating evidence and coercing statements from witnesses and suspects.

17.     Plaintiff brings this action against Defendants, Nordo, Dove and the City, under 42 U.S.C. §1983 for violations of the Fourth and Fourteenth Amendments to the U.S. Constitution, as well as supplemental claims under state law, seeking compensation for extraordinary harms and losses.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this Amended Complaint under 42 U.S.C. §1983 and 28 U.S.C. §§1331, 1343(a)(3), 1343(a)(4) and 1367(a).

19.     Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §1391(a) in that the Defendants are subject to personal jurisdiction within the Eastern District of Pennsylvania and the events that gave rise to this action occurred within the Eastern District of Pennsylvania.

20.     The matter in controversy exceeds Seventy-Five Thousand ($75,000) Dollars.

## PARTIES

21.     Plaintiff, Donte Hill, age 25 at the time of his arrest on August 5, 2014, is and was, at all times relevant to this Amended Complaint, a resident of Philadelphia, Pennsylvania.

22.     Defendant, City of Philadelphia, is a municipality in the Commonwealth of Pennsylvania and owns, operates, manages, directs and controls the Philadelphia Police Department ("PPD"), which, at all times relevant to this Amended Complaint, employed Defendants, Nordo and Dove.

23.     Defendant Nordo, was at all relevant times employed as a detective with the PPD. He is sued in his individual capacity.

24.     Defendant Dove, was at all relevant times employed as a detective with the PPD.  He is sued in his individual capacity.

25.     At all times relevant to this Amended Complaint, Defendants acted under color of state law.

## OPERATIVE FACTS

26.     Paragraphs 1 through 25 are hereby incorporated by reference as if fully set forth at length herein.

27.     In the early hours of Wednesday, July 6, 2011, Mr. Wright was murdered when he was shot multiple times just moments after leaving Coo's Sports Bar located at 822 North Broad Street in North Philadelphia.

28.     Shortly after Police Officer ("P/O") Washington [#1334] arrived at the crime scene and began securing it, he was approached by Kenneth Williams who, unprovoked and voluntarily, stated that he witnessed the shooting. Mr. Williams stated that he witnessed a Black male with a braid hairstyle shoot Mr. Wright.

29.     On July 6, 2011 at 04:15, Kenneth Williams was interviewed at the Police Homicide Unit by Detective Pirrone and Detective Santamala regarding the killing of Mr. Wright.

(a) Mr. Williams stated that at about 01:00, he was parking his car at Coo's Sports Bar when he heard a car alarm, and then heard three gunshots. Mr. Williams said they came from "the little street behind the bar," saw the muzzle flash, and saw someone running. Mr. Williams told his uncle, who worked security at Coo's Sports Bar.

(b) Mr. Williams stated that he exited the bar as it closed and began crossing the street towards the gas station at the 1300 block of Brown Street. At that time, he witnessed a male approaching two guys who were standing on the corner of the gas station from behind. One of the two men standing on the corner of the gas station was shot in the leg, and the other was shot in the head. Mr. Williams saw the muzzle flash, heard three shots, and saw one of the two men standing on the corner of the gas station fall, while the other man limped out into Broad Street.

(c) Mr. Williams described the shooter as a Black male, 5'8-5'10, facial hair, and had a hood up but with otherwise visible braids on the side. Mr. Williams recalls seeing the shooter inside Coo's Sports Bar moments prior to the shooting "with his braids pulled back" and wearing a thin, charcoal gray hoodie with the sleeves pulled up.

(d) Mr. Williams saw a white 2011 Charger parked in front of the bar that made a U-turn and "took off up Broad Street." He also saw a car pick up the guy shot in the leg.

30.     At the conclusion of his July 6, 2011, 04:15 interview at the Homicide Unit, Mr. Williams had on two occasions stated that he witnessed the shooting of Mr. Wright and has provided a consistent,

detailed description of Mr. Wright's killer, which includes a Black male with a braid hairstyle "pulled back."

31.　　On July 6, 2011, less than twenty-four hours after the slaying of Mr. Wright and his providing of his second statement to investigators of Mr. Wright's killing, at 20:35 Kenneth Williams was interviewed again at the Police Homicide Unit. This time, Mr. Williams was interviewed by homicide detective and Defendant Dove, and detective Harkins regarding the killing of Mr. Wright.

(a) Mr. Williams explained that shortly before this interview, he was taken to the crime scene by the interviewers and showed them where he was when he saw the shooting and where everyone else was, including "the dead guy" and "the fat guy that was limping away."

(b) Mr. Williams reviewed his first interview, taken earlier that same day, and affirmed that everything was correct, while clarifying that the first set of gunshots that he heard was not the time that he saw the "two guys get shot." Additionally, he stated "I don't think those shots had anything to do with the shooting that I saw after the bar let out."

(c) Consistent with his first interview, Mr. Williams re-explained that he was crossing Broad Street at the time of the shooting of Mr. Wright.

(d) Mr. Williams again stated that the shooter had his braids pulled back and pointed to a photograph from Coo's Sports Bar taken the night of the shooting of an individual with similar hair (but not the shooter).

(e) Mr. Williams was shown video surveillance from Coo's Sports Bar from the night of the shooting. Mr. Williams identifies the shooter in the video surveillance.

32.　　At the conclusion of his of July 6, 2011, 20:35 Homicide Unit interview, Mr. Williams had provided police with three (3) statements, containing a consistent, robust description of the Mr. Wright's killer having braids pulled back. First, Mr. Williams described this to P/O Washington at the scene of the shooting. Second, Mr. Williams used this description again at the Homicide Unit ~ two (2) hours after the shooting. Now, third, Mr. Williams provided a second interview at the Homicide Unit where he, once again, said the shooter had braids pulled back.

33.　　As of July 6, 2011, neither Plaintiff's name, Dante Hill, nor a description matching Plaintiff, were mentioned throughout any of the initial investigation interviews or other statements provided to detectives as a potential suspect in the shooting of Mr. Wright.

34.     Upon information and belief, Defendant Dove and/or Defendant Nordo continued to investigate the killing of Mr. Wright, through the conducting of several interviews with responding law enforcement officers and Coo's Sports Bar attendees on the night of killing.

35.     Pursuant to an ongoing pervasive, systematic, egregious and ultimately unconstitutional practice, custom, or policy, witnesses were first privately engaged by Defendant Dove and/or Defendant Nordo, where they were coerced into adopting statements fabricated by the Defendant homicide detectives. Subsequent to being engaged by Defendant Dove and/or Defendant Nordo, the witnesses would then meet with other homicide detectives to have their fabricated statements documented. This conduct, in direct violation of the constitution, led to statements from Mr. Williams and Mr. Corbett inculpating Plaintiff.

36.     On July 10, 2011, Gary Corbett's statement was documented at the Police Homicide Unit by homicide detective and Defendant Dove and Detective Harkins regarding the killing of Mr. Wright.

(a)   Mr. Corbett stated that he was at Coo's Sports Bar with Mr. Wright the night of the fatal shooting.

(b)   After leaving Coo's, meeting Ryseen outside and while walking with him and some girls parked on "that little block next to the gas station," the shooting started. After the first shot, Mr. Corbett ducked down and started running.

(c)   Mr. Corbett says he saw the shooter, and that the shooter was wearing a black t-shirt with "PUMA" across the front. In stark contrast to Mr. Williams, the only other witness to have identified the shooter, Mr. Corbett describes the shooter as "thin" and "has a low haircut." He also says he recognized the shooter and that he's from Jefferson Street, around 17th or 19th and Jefferson.

(d)   Mr. Corbett is presented with a photo array and identifies #7, assigned to Dante Hill, as the shooter of Mr. Wright. He also identifies Byron Davis stating "I heard he got shot too."

37.     Though many interviews with Coo's Sports Bar attendees and responding law enforcement were conducted in the days following Mr. Wright's killing, Gary Corbett's July 10, 2011 interview with Police Homicide Unit detectives, including Defendant Dove, was the first time Plaintiff was personally and specifically identified by an eyewitness as Mr. Wright's killer. Additionally, that same interview for Mr. Corbett was the first mention of the shooter's physical description being one that did not contain braids and, in stark contrast, described the shooter as having a low haircut, one similar to Plaintiff's.

38.     On November 15, 2013, Gary Corbett was interviewed by Homicide Unit Sergeant Wilkins and Detective Gaul regarding the shooting death of Mr. Wright. Mr. Corbett testified in the following manner:

    (a)  Mr. Corbett identified Dante Hall as the shooter via photo lineup once again.

    (b)  Mr. Corbett reviewed his July 10, 2011 interview statements and affirmed that they are truthful.

    (c)  Mr. Corbett testifies that as he and Mr. Wright were walking down the street talking to some girls, he hears 3-4 shots and sees Dante Hall "tucking" the gun. At the time of the shooting, Dante had on a black hooded shirt on.

39.     Gary Corbett's November 15, 2013 statement to homicide detectives, occurring over two (2) years after the killing of Mr. Wright, was Plaintiff's second time being personally and specifically identified by an eyewitness to Mr. Wright's killing.

40.     The Philadelphia Police Department Homicide Unit maintained an "Activity Sheet," containing material details and updates pertaining to the July 6, 2011 fatal shooting of Mr. Wright.

41.     Despite not being mentioned in the Homicide Unit Interview reports, Activity Sheets confirm that Defendant Nordo was intimately involved with the investigation of Mr. Wright's killing, including the interviewing of witnesses, in December of 2013.

42.     It is upon information and belief that Defendant Nordo interrogated, used coercive tactics, physically abused witnesses to obtain a fabricated statement inculpating Mr. Hill.

43.     On December 17, 2013 and for a now third time, Kenneth Williams' statement was documented at the Police Homicide Unit by detective Verrecchio and detective Gaul regarding the July 6, 2011 fatal shooting of Mr. Wright.

    a.  After over two (2) years' time since his prior interviews with PPD, Mr. Williams states that both his provided July 6, 2011 interview statements were not accurate.

    b.  In Mr. Williams' two (2) prior investigative interviews, both taking place on the same day as the killing of Mr. Wright, Mr. Williams identified the shooter to have "braids pulled back." However now, Mr. Williams states that he cannot say for sure that the guy with braids shot Mr. Wright.

    c.  In Mr. Williams' two (2) prior investigative interviews, both taking place on the same day as the killing of Mr. Wright, Mr. Williams confirmed that he saw the shooting of Mr.

Wright occur. However now, Mr. Williams states that he cannot say for sure who did the shooting.

    d.    In Mr. Williams' two (2) prior investigative interviews, Mr. Williams provided a detailed account of the time the shooting occurred, including the direction he was walking, where the two individuals who were shot was standing, where other bystanders were, and even took the investigators back to the scene of the shooting to show them how everything occurred. However now, after review of the two previous interview statements, Mr. Williams claims that he barely remembers saying half the things that are in these interviews, has a foggy memory, and that he was very intoxicated on the night of the shooting.

    e.    Though he claimed to be very intoxicated, later in the same interview when asked how much he was drinking on the night of the shooting, Mr. Williams states "I was drinking, but I was OK."

    f.    Though he claimed to be unable to remember giving his prior statements on June 6, 2011, nor can he say for sure who shot Mr, Wright, in the same interview Mr. Williams claims to have seen Dante Hill (a/k/a "Tey") shoot Mr. Wright twice, and shoot the other victim one time in the leg.

44.    During the same month and year that Homicide Unit Activity Sheets confirm Defendant Nordo's involvement in the investigation of Mr. Wright's killing, eyewitness Kenneth Williams provides a new brand version of how the July 6, 2011 shooting occurred—a version that now directly inculpates Plaintiff as the Mr. Wright's killer.

45.    As of 2013, Defendant City was aware of credible complaints that Defendant Dove had engaged in consistent and pervasive misconduct with suspects and informants. Despite Defendant City's awareness of facts demonstrating this alarming and criminal pattern and practice of behavior, Defendant City failed to train, supervise or discipline Defendant Dove.

46.    Despite numerous credible complaints lodged against Defendant Dove to the PPD, and then forwarded to the District Attorney's Office, Defendant Dove was neither charged nor disciplined.

47.    In November 2013, Detective Dove was fired by the PPD, amid allegations that Defendant Dove had been engaging in police misconduct with potential witnesses and suspects for many years.

48.    On January 22, 2015, Defendant Dove was arrested for conspiracy, harboring a fugitive, obstruction of justice and tampering/fabricating evidence regarding the death of Cesar Vera on September 8, 2014. Defendant Dove entered into a negotiated guilty plea – serving thirty (30) days in prison with three

(3) years of reporting probation. On July 24, 2017, Defendant Dove began to serve his thirty (30) day prison sentence.

49.     Defendant Nordo's prolific police misconduct resulted in his arrest, subsequent conviction of rape, sexual assault, official oppression, and related crimes and sentencing of 24.5-49 years in prison. One of the victims for which he was convicted is the key witness in the Hill investigation, Kenneth Williams.

## CITY KNEW ABOUT DEFENDANT NORDO

50.     At least as early as 2005, Defendant City was aware of credible complaints that Defendant Nordo, in his role as a Philadelphia police detective, groomed suspects for future sexual relationships. In grooming these suspects, Defendant Nordo promised leniency or reward money, used threats and coercion, and engaged in sexual assault. Defendant Nordo used his position to cause witnesses to sign false or inaccurate interview statements and confessions. Despite its awareness of these credible complaints, Defendant City failed to supervise, discipline or train Defendant Nordo.

51.     Despite numerous credible complaints lodged against Defendant Nordo to the PPD, and then forwarded to the District Attorney's Office, Defendant Nordo was neither charged nor disciplined.

52.     Despite these complaints, in 2009, Defendant City promoted Defendant Nordo to the Homicide Unit. In that assignment, Defendant Nordo continued to engage in coercive grooming and assaultive behavior, including fabricating evidence and coercing fabricated statements from witnesses and suspects.

53.     As a homicide detective, Defendant Nordo was given access and opportunity, as well as wide latitude, to conduct homicide investigations. Defendant Nordo was then able to continue his misconduct for years, unfettered, as Defendant City failed to institute any oversight or supervision over his conduct. Defendant Nordo's conduct, facilitated by Defendant City's deliberate indifference, led to the wrongful conviction and imprisonment of several men, including Plaintiff.

54.     In 2017, Defendant Nordo was fired by the PPD, amid allegations that Defendant Nordo had been engaging in police misconduct with potential witnesses and suspects for many years. In February

2019, Defendant Nordo was indicted by a Grand Jury on multiple counts of rape, involuntary deviate sexual intercourse, sexual assault, misconduct, intimidation, and theft of city funds.

55.     Upon information and belief, Mr. Williams was one of the victims of Defendant Nordo who later testified against Defendant Nordo in his criminal trial which ultimately led to Defendant Nordo's criminal conviction.

56.     After the Grand Jury indictment, the PPD acknowledged that Defendant Nordo's criminal behavior was as a result of a lack of oversight and proper supervision.

### PLAINTIFF MALICIOUSLY TARGETED AND PROSECUTED BY DEFENDANTS

57.     In August 2014, Plaintiff became a victim of Defendants Nordo and Dove's misconduct and intimidation.

58.     Defendant Dove's misconduct began with the initial investigation into the shooting death of Mr. Wright on July 11, 2011 and continued until he was fired in November 2013.

59.     The misconduct by the PPD continued when Defendant Nordo took over the investigation of Mr. Wright's death, which misconduct led to an Affidavit of probable cause to support a warrant for Plaintiff's arrest, based on tampered eyewitness testimony and fabricated evidence by Defendants, Dove and Nordo.

60.     On August 5, 2014, Plaintiff was arrested, detained and confined in prison for murder charges.

61.     Upon information and belief, the affidavit of probable cause utilized to arrest Plaintiff in relation to Mr. Wright's killing failed to include several pieces of exculpatory evidence, including the recanting of statements inculpating Plaintiff to the killing of Mr. Wright, as well as photographs from the time of the shooting, including crime scene photographs and photographs of inside the Coo's Sports Bar of potential suspects matching eyewitness descriptions.

62.     On November 12, 2014, eyewitness Gary Corbett testified at the preliminary hearing in Commonwealth v. Dante Hill.

    a.  At the preliminary hearing, Mr. Corbett testified that he did not see who shot Mr. Wright on July 6, 2011 although he was there at the time of the shooting. Mr. Corbett testifies that he did not see who did the shooting, as he was "worried about getting the fuck out of there."

    b.  Mr. Corbett states that during his July 10, 2011 interview with Defendant Dove, he was shown surveillance footage from Coo's Sports Bar. Mr. Corbett did not see anyone on surveillance, or while he was in person that night, holding a gun, including Plaintiff.

    c.  Mr. Corbett states that he voluntarily went down to the Homicide Unit to provide a statement on July 10, 2011 because the police threatened to contact his probation officer.

    d.  Mr. Corbett states that following his July 10, 2011 interview with police, they did not arrest anyone for the murder of Mr. Wright because he couldn't say he saw anything. However, when he gave his interview in 2013, he was incarcerated for robbery.

    e.  In describing how he provided false statement, Mr. Corbett describes the condition upon which he was interviewed in 2013. The police "came and got me from CFCF one morning. They left me in there all night long with the light on. They ain't feed me or nothing. And then they said, well, if you do what I say, then we'll feed you and let you go."

    f.  Mr. Corbett remembers that it was not Doug (sic) that interviewed him in 2013. He remembers seeing Doug (sic) was "in some kind of trouble" in the newspaper.

63.    Plaintiff's counsel conducted an extensive investigation into the irregularities, tampered eyewitness testimony and fabricated evidence against Plaintiff.

64.    In investigating the killing of Mr. Wright, Defendants Dove and/or Nordo were involved in the unconstitutional interrogation and fabrication of evidence of witness, Kenneth Williams, causing him to produce false statements. These false statements were then documented by police interviewers Verrecchio and Gaul.

65.    In investigating the killing of Mr. Wright, Defendants Dove and/or Nordo were involved in the unconstitutional interrogation and fabrication of evidence of witness Gary Corbett, causing him to produce false statements. These false statements were then documented by police interviewer Harkins and Defendant Dove.

66.    Defendants Dove and Nordo failed to produce evidence that was exculpatory in nature, including crime scene photographs, as well as knowledge and information that several eyewitness'

statements inculpating Plaintiff in the killing of Mr. Wright were coerced and fabricated, which would have confirmed that Plaintiff did not, and could not, have committed the murder of Mr. Wright.

67.     In failing to produce evidence that was exculpatory in nature, Defendants Nordo and Dove ignored the truth and instead locked their targets onto Plaintiff, leading to Plaintiff being maliciously prosecuted for a murder Defendants Nordo and Dove knew he did not commit.

68.     Both eyewitnesses Kenneth Williams and Gary Corbett were interviewed during the investigation of the murder of Mr. Wright by Defendant Dove and/or Nordo.

69.     On January 5, 2017, eyewitness Gary Corbett drafted a handwritten letter stating that Plaintiff did not kill Mr. Wright, and he in fact did not know who killed Mr. Wright, and that he only previously agreed inculpate Plaintiff in the murder was because "Detective Dove promised I could get back sooner if I just signed the statement prepared." The handwritten letter can be seen below as follows:



70.     Plaintiff's Counsel petitioned the Court to dismiss his murder charges based on Defendants Nordo and Dove's misconduct on September 15, 2017.

71.     On September 26, 2017, the Honorable Steven R. Geroff granted the Prosecution's Motion to *Nolle Prosse.*

72.     On September 26, 2017, Plaintiff was finally released from prison. By that time, Plaintiff had been imprisoned for over three (3) years.

73.     Plaintiff repeatedly and adamantly proclaimed his innocence throughout his detainment.

74.     Over the course of those three (3) years in prison, Plaintiff endured countless indignities, physical and mental injuries that are permanent and pervasive. Plaintiff's injuries persist and will continue into the future.

75.     The unlawful, intentional, willful, deliberately indifferent and reckless actions and omissions of the Defendants caused Plaintiff to be improperly arrested and imprisoned, and forced to serve over three (3) years in prison for a brutal crime he did not commit.

76.     As a direct result of Defendants' conduct and omissions, Plaintiff sustained injuries and damages including loss of freedom for more than three (3) years, loss of his youth, pain and suffering, mental anguish, emotional distress, indignities, degradation, permanent loss of natural psychological development and restrictions on all forms of personal freedom including, but not limited to, diet, sleep personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment and freedom of speech and expression.

77.     As a direct result of the Defendants' conduct and omissions, Plaintiff sustained economic injuries and damages, including loss of income and loss of career opportunities.

78.     Plaintiff maintained his innocence and once Detectives Nordo and Dove's misconduct came to light, he petitioned the Court to dismiss his case. The investigation into Plaintiff's wrongful arrest shed light on the facts surrounding Detectives Nordo and Dove's misconduct of tampering with eyewitness testimony and fabricating evidence against Plaintiff, which led to an Affidavit of probable cause to support a warrant for his arrest.

79.     With respect to the murder charges brought against him, Plaintiff proclaimed his innocence, committed no crime, nor was there any evidence linking him to the murder of Mr. Wright, other than the tampered eyewitness testimony and fabricated evidence by Defendants, Nordo and Dove. Other than this illegally obtained testimony and evidence, there was no basis to believe that Plaintiff had violated and federal, state or local law.

80.     Defendants, Nordo and Dove, had no legal cause to believe that Plaintiff committed the murder of Mr. Wright.

81.     By Defendants Nordo and Dove's misconduct in tampering with eyewitness testimony and fabricating evidence against Plaintiff, Defendants, Nordo and Dove, with malice, caused the unlawful prosecution of Plaintiff.

82.     At no time did Defendants, Nordo and Dove, disclose to prosecutors that they had fabricated evidence to support the prosecution of Plaintiff, nor did they disclose to prosecutors that they had tampered with eyewitness testimony.

83.     Defendant City, through its deliberate indifference to longstanding practices of PPD officers' inappropriate use of their positions to cause witnesses to sign false or inaccurate interview statements, the ineffective oversight of the Internal Affairs Department, and its failure to respond to years of credible reports of Defendants Nordo and Dove's misconduct, was a moving force in causing the violations of Plaintiff's constitutional rights.

84.     At all relevant times, as outlined above, Defendants Nordo and Dove's conduct was in willful, reckless and callous disregard of Plaintiff's rights under federal and state law.

**THE PPD'S PATTERN AND PRACTICE OF UNCONSTITUTIONAL MISCONDUCT IN
HOMICIDE INVESTIGATIONS, INCLUDING THE FABRICATION OF EVIDENCE,
COERCION AND SUGGESTION OF FALSE STATEMENTS FROM WITNESSES AND
SUSPECTS, AND SUPPRESSION OF EXCULPATORY EVIDENCE**

85.     The PPD has exhibited a pervasive pattern and practice of unconstitutional misconduct in
their homicide investigations, including coercion of false statements from witnesses and suppression of
exculpatory and inconsistent evidence, that dates back to at least the early 1970's and has continued beyond
the Defendants' investigation and prosecution of Mr. Hill.

86.     For many years, dating back at least to the 1970's, and continuing well beyond the time of
the investigation of Mr. Wright's murder, Defendant City of Philadelphia had, in force and effect, a policy,
practice or custom of unconstitutional misconduct in homicide investigations, and in particular, using
coercive techniques in interviews and interrogations to obtain statements, fabricating inculpatory evidence
and withholding exculpatory evidence.

87.     At the time of the investigation and prosecution of Mr. Hill, the PPD had a policy, practice
or custom involving the use of various techniques to coerce false statements, including, but not limited to,
subjecting witnesses to needlessly prolonged interrogations and interviews, failing to record
interviews/interrogations, isolation, making promises, regardless of their truthfulness, threatening charges
for unrelated misconduct, offering assistance in unrelated criminal matters, interviewing witnesses while
they are under the influence of drugs that make them more susceptible to coercion, and assertions that the
witness will benefit from making a statement that assists the police or suffer some sort of disadvantage if
they refuse.

88.     At the time of the investigation and prosecution of Mr. Hill, the PPD had a policy, practice
or custom involving the use of various techniques to suppress and/or withhold exculpatory or inconsistent
statements and evidence, in violation of their known duty under Brady, including, but not limited to, making
false statements to prosecutors about the existence of evidence, failing to provide complete Homicide files
to prosecutors, coercing witnesses into keeping exculpatory and inconsistent information from prosecutors,
disregarding or deleting exculpatory and inconsistent information from Homicide files, ignoring

exculpatory and inconsistent information so that there is no record to be deleted from Homicide files, threatening witnesses in possession of exculpatory and inconsistent information to prevent them from coming forward to prosecutors or testifying and deleting information of key exculpatory witnesses so that they do not testify at trial.

89.     This policy, practice or custom involved the use of various techniques to coerce inculpatory statements, including, without limitation, isolation, separating juvenile or otherwise vulnerable suspects or witnesses from their friends and family, subjecting individuals to needlessly prolonged interrogations, making false promises, including the promise that a suspect or witness will be allowed to go home if he or she makes an inculpatory statement, the use or threat of physical violence, authoritative assertions of a suspect's guilt, including, without limitation, confrontation with false inculpatory evidence, and providing false assurances that the suspect will benefit from making an inculpatory statement that minimizes the suspect's own involvement.

90.     This policy, practice or custom also involved the use of various techniques to make false statements appear true and reliable, including, without limitation, providing a witness or suspect with details about the crime that only the perpetrator or police could know, whether through leading questions or more direct communication, taking misleading steps to make coerced statements appear as if they originated from the suspect following a lawful interrogation, selectively documenting a witness or suspect's eventual statement and not the preceding interrogation, preparation and rehearsal, and misrepresenting that a suspect's formal statement was a verbatim statement in the suspect's own words.

91.     These practices were well known to Defendant, City of Philadelphia, and its policymakers, with respect to criminal investigations and prosecutions as a result of newspaper investigations, including Pulitzer Prize winning reporting in the *Philadelphia Inquirer* in 1977-1978, governmental investigations, complaints from lawyers and civilians, and internal police investigations, including the PPD's 39th District Corruption Scandal in the 1990's, complaints lodged by the public, prior litigation and internal police investigations.

17

92.     The 39th District Corruption Scandal involved widespread unconstitutional practices that were not appropriately addressed or remediated despite pervasive knowledge throughout the PPD and Defendant, City of Philadelphia.  The police misconduct in the 39th District Corruption Scandal included constitutional violations that mirror those violations suffered by Mr. Hill, including omission of material information and suppression of exculpatory evidence and coercive interrogation tactics, and false allegations of criminal conduct.  The PPD was deliberately indifferent to the officer's misconduct and credible complaints to their internal compliance department were disregarded.

93.     Various cases demonstrate that this misconduct was pervasive within the PPD at time of the investigation into Mr. Wright's murder and the subsequent prosecution of Mr. Hill.  This misconduct was pervasive within the PPD's Homicide Unit before and after its investigation of Mr. Hill and, upon information and belief, the misconduct described in this Complaint was expressly or tacitly committed or deliberately ignored when committed in the presence of the Homicide Unit and the PPD supervisors or because of their deliberate indifference to this misconduct.

94.     Numerous other convictions that later resulted in exonerations demonstrate the pervasive patterns, practices and customs of official misconduct within the Homicide Unit of the PPD include:

    **(a) Raymond Carter**
    **(b) Anthony Wright**
    **(c) Eugene Gilyard and Lance Felder**
    (d) **Carlos Hernandez** and **Ed Williams**
    (e) **Jackie Combs, Jr.**
    (f) **Willie Veasy**
    (g) **Percy St. George**
    (h) **Jimmy Dennis**
    (i) **Donald Ray Adams**
    (j) **Andrew Swainson**
    (k) **Walter Ogrod**
    (l) **James Dennis**
    (m) **Shaurn Thomas**
    (n) **Donald Outlaw**
    (o) **Willie Stokes**

95.     As a result of a pattern of police misconduct that was in effect at the time of the investigation of the murder of Mr. Wright for which Mr. Hill was charged, the United States District Court for the Eastern District of Pennsylvania entered a consent decree in the matter of NAACP v. City of

Philadelphia requiring widespread reforms in the PPD, while also limiting certain aspects of their investigative practices and policies.

96.     This practice, as exemplified by the investigation into Mr. Hill's malicious prosecution, and those wrongful convictions detailed hereinabove, continued for years due to the deliberate indifference of the PPD and Defendant, City of Philadelphia, to these policies, practices and customs.

97.     During the 1980's and early 1990's, and concurrent with the time of the investigation and prosecution of Mr. Hill by the PPD, there was, within the PPD a pattern, practice and custom of violating the constitutional rights of criminal suspects and others, including systemic violations of the Fourth and Fourteenth Amendments.  On three (3) separate occasions in the 1980's, courts in the Eastern District of Pennsylvania issued orders enjoining the PPD from engaging in these practices:

> (a) **Cliett v. City of Philadelphia:**  Consent decree arising out of "Operation Cold Turkey", that resulted in the unlawful arrest and detention of 1500 individuals in drug enforcement practices);
>
> (b) **Spring Garden Neighbors v. City of Philadelphia:**  Enjoining police sweeps of Latinos in Spring Garden area in a homicide investigation);
>
> (c) **Arrington v. City of Philadelphia:**  Enjoining stops, detentions and searches of African-American men during investigation of the "Center City Stalker").

98.     At the time of the investigation and prosecution of Mr. Hill, the PPD had a practice, policy and custom of:

> (a) Engaging in unlawful interrogation of suspects, witness detentions and interrogations, planting of evidence, fabrication of witness and suspect statements, and failing to disclose exculpatory evidence;
>
> (b) Failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct;
>
> (c) Failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search and arrest powers;
>
> (d) Ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights in the course of police investigations and prosecutions of criminal suspects and Defendants, including unlawful police interrogations, searches, arrests, coercion of witnesses, falsifying and fabrication of evidence and suppression of exculpatory evidence;
>
> (e) Failing to properly sanction or discipline PPD officers, who are aware of and conceal and/or aid and abet violations of constitutional rights of individuals by other PPD officers, thereby causing and encouraging PPD police, including the Defendant officers in this case,

to violate the rights of citizens, such as Mr. Hill.

99.    At the time of the investigation and prosecution of Mr. Hill, and for many years before and thereafter, the PPD and Defendant, City of Philadelphia, has been deliberately indifferent to the need to train, supervise and discipline police officers.  The Internal Affairs Division (IAD) of the PPD has failed to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the following respects:

(a)  excessive and chronic delays in resolving disciplinary complaints;

(b)  a lack of consistent, rational and meaningful disciplinary and remedial actions;

(c)  a failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

(d)  the PPD's internal investigatory process fell below accepted practices and was arbitrary and inconsistent;

(e)  the PPD discipline, as practiced, was incident-based rather than progressive, thus, repeat violators were not penalized in proportion to the number of violations;

(f)  the conduct of IAD investigations demonstrated that PPD internal affairs personnel were not adequately trained and supervised in the proper conduct of such investigations;

(g)  a global analysis of IAD's investigatory procedures indicated a pattern of administrative conduct where the benefit of the doubt was given to the officer rather than the complainant;

(h)  serious deficiencies in the quality of IAD investigations and the validity of the IAD findings and conclusions;

(i)  lack of an effective early warning system to identify, track and monitor "problem" officers;

(j)  IAD frequently failed to interview available eyewitnesses to incidents involving citizen complaints of misconduct, interviews that were conducted were below acceptable standards of police practice and failed to address key issues; and

(k)  IAD failed to acknowledge the disproportionate use of force used by police officers in the investigation of citizen complaints and failed to properly categorize the police officers' misconduct in those cases as an impermissible use of force.

**COUNT I: 42 U.S.C. §1983**
**Malicious Prosecution in Violation of the Fourth and Fourteenth Amendments**

100.     Plaintiff incorporates by reference all of the foregoing paragraphs

101.     The individual Defendants, acting individually and in concert with malice, and knowing that probable cause did not exist to prosecute Mr. Hill for Mr. Wright's murder, intentionally caused Mr. Hill to be arrested, charged and prosecuted for those crimes, thereby violating Mr. Hill's clearly established right, under the Fourth and Fourteenth Amendments of the U.S. Constitution, to be free of prosecution absent probable cause.

102.     The individual Defendants, acting individually and in concert, fabricated evidence and intentionally withheld and misrepresented exculpatory evidence, all of which resulted in the arrest and prosecution of Mr. Hill without probable cause.

103.     The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Hill's clearly established constitutional rights.  No reasonable officer would have believed this conduct was lawful.

104.     The prosecution finally termination in Mr. Hill's favor on September 15, 2017, after his charges were dismissed.

105.     The acts and omissions by the individual Defendants, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Hill's injuries because these Defendants knew, or should have known, that their conduct would result in the wrongful arrest, prosecution, conviction, and incarceration of Mr. Hill.

**COUNT II: 42 U.S.C. §1983**
**Deprivation of Liberty without Due Process of Law and Denial of a Fair Trial by Fabricating
Evidence, Withholding Material Exculpatory and Impeachment Evidence**

106.     Plaintiff incorporates by reference all of the foregoing paragraphs.

107.     The individual Defendants, acting individually and in concert, and within the scope of their employment with the PPD, deprived Mr. Hill of his clearly established constitutional right to due process of law and to a fair trial by fabricating inculpatory evidence and deliberately using coercion and/or suggestion to obtain inculpatory witness statements, including, without limitation, the false statements of Mr. Corbett and Mr. Williams.

108.     The individual Defendants deprived Mr. Hill of his right to a fair trial by withholding material exculpatory and impeachment evidence from prosecutors and defense, including, without limitation, information regarding the true circumstances of Mr. Wright's murder, including Mr. Corbett and Mr. Williams' interrogations and their actual statements, prior to Defendants' coercion and fabrication of their false statements - that these witnesses had no information implicating Mr. Hill.  Defendants also withheld information regarding other exculpatory photographic evidence.

109.     The individual Defendants deprived Mr. Hill of his right to a fair trial by deliberately failing to conduct a constitutionally adequate investigation, including, without limitation, by failing to pursue information from various witnesses, which would have led to the true killer.

110.     The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Hill's clearly established constitutional rights.  No reasonable officer would have believed this conduct was lawful.

111.     Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Hill's injuries.  Defendants knew, or should have known, that their conduct would result in Mr. Hill's wrongful arrest and prosecution and incarceration.

112.     On  September 26, 2017, Plaintiff was finally released from prison.  By that time, Plaintiff had been imprisoned for over three (3) years.

113.     As a direct and proximate result of Defendants' actions, Plaintiff was wrongly prosecuted, detained and incarcerated for over three (3) years and sustained other injuries and damages as set for above.

**COUNT III: 42 U.S.C. §1983**
**Municipal Liability Claim**

114.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs.

115.     Defendant, City of Philadelphia, by and through its final policymakers, had in force and effect during time of Mr. Hill's wrongful arrest and conviction, and for many years preceding and following this investigation, a policy, practice or custom of unconstitutional misconduct in homicide and other criminal investigations, including, in particular, the use of coercive techniques in interviews and interrogations to obtain confessions, the fabrication of inculpatory evidence, the fabrication of incriminating statements from witnesses, suspects and arrestees by coercion, suggestion, and feeding details about the crime, and the withholding of exculpatory evidence.

116.     Final policymakers for Defendant, City of Philadelphia, had actual or constructive notice of these practices, policies and customs, but repeatedly failed to make any meaningful investigation into charges that homicide detectives were using coercive techniques in interviews and interrogations to obtain confessions, withholding exculpatory evidence, fabricating inculpatory evidence, and, particularly, fabricating incriminating statements from witnesses, suspects and arrestees by coercion, suggestion and feeding details about the crime, and failed to take appropriate remedial and/or disciplinary actions to curb this pattern of misconduct.

117.     Such unconstitutional municipal customs, practices and/or policies were the moving force behind the false, coerced and fabricated statements used against Mr. Hill, causing his arrest, prosecution, and three (3) years of incarceration, as well as all the other injuries and damages set forth hereinabove.

118.     Defendant City caused the violation of Plaintiff's constitutional rights.  As evidenced by the lengthy history of misconduct involving PPD officers' investigative practices in general, and credible reports of Defendants Nordo and Dove's misconduct in particular, Defendant City, with deliberate

23

indifference, employed a custom, pattern, practice or policy of allowing officers to use their position to cause witnesses to sign false or inaccurate interview statements and/or failed to train, supervise and/or discipline officers who engaged in such conduct. The misuse of their position when interviewing witnesses to which Defendant City was deliberately indifferent included officers:

    (a) Coercing false statements from witnesses;
    (b) Making false statements or reports regarding the information provided by a coerced witness;
    (c) Coercing or threatening witnesses to provide information; and/or
    (d) Fabricating evidence against witnesses/suspects.

**COUNT IV**
**State Law Claim**

119.     The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

120.     Defendants Nordo and Dove's knowing, intentional and/or reckless false statements were the direct and proximate cause of the prosecution of Plaintiff for the murder of Mr. Wright. Defendants, Nordo and Dove, caused the prosecution of Plaintiff without probable cause and they acted with malice or specific intent to injure.

121.     Plaintiff suffered a deprivation of liberty as a result of the prosecution. Plaintiffs arrest for the murder of Mr. Wright was vacated and the charges were withdrawn.

**WHEREFORE,** Plaintiff, Donte Hill, seeks damages against Defendants, jointly and severally, in an amount in excess of $75,000, including costs of suit, interest, attorney's fees, punitive/exemplary damages and such other relief as this Honorable Court deems appropriate.



*Anwar Abdur-Rahman*

ANWAR ABDUR-RAHAN, ESQUIRE
Identification No. 330191
2001 Market Street, Suite 3700
Philadelphia, PA 19103
TEL: 215-960-0400
EML: anwar@vscplaw.com
*Attorneys for Plaintiff*

Dated: December 30, 2022